I will move to our next case, which is U.S. Bank v. Sun Life Insurance. Mr. Gosselin. May I please the Court? My name is Jason Gosselin of Drinker, Biddle & Wreath, and I represent the appellant Sun Life. This appeal presents two issues. The first is whether the district court erred in finding that Wisconsin's insurable interest statute trumps its anti-wagering statute. Trumps what? The anti-wagering statute. There's a statute that specifically says all gaming contracts are void. The second issue is whether the district court erred in finding that Sun Life engaged in objective bad faith merely by initiating an investigation when it received a $6 million death claim. I'm here on behalf of Sun Life asking the Court to reverse the district court. Before I go any further, I don't want to talk too much about the facts, but there is one fact that I think is important to bring out. This case, both the breach of contract claim against Sun Life and the bad faith claim against Sun Life were decided on a motion on the pleadings. Sun Life actually had pled the affirmative defense that the policy at issue was an illegal wagering contract under this anti-gaming statute. We allege certain facts that created an inference that this was likely a wager. The truth of the matter is Sun Life never completed its investigation, so it never truly made a final decision, but there was enough indicia that the company felt it was important to begin the investigation. Nevertheless, for purposes of the trial court below and the appeal, the question is whether the anti-wagering statute has no effect because of the insurable interest statute. We have to accept as a matter of fact. Have Wisconsin courts applied the anti-wagering statute to insurance contracts? I'm not aware of any cases where a court has. Yes, well I've looked too. That statute has been on the books for a very long time. It seems odd to say that a federal court should say that it applies to insurance contracts when the state judiciary appears not to have done so. Well, let me correct myself. Yes, the Wisconsin Supreme Court has said that the anti-wagering statute applies to insurance contracts. There is a case we cited in our briefs. What case is that? I want to say Ben Hur, I believe, is the case. That was not a life insurance case, and the position that the trial court took is that it's never been applied to a life insurance case, so it doesn't apply to life insurance. Our position is that the statute itself says that all gaming contracts are legal. It's clear from the words of the statute that the substance controls over the form, and there's a carve-out for insurance contracts, and it says that if an insurance contract is made in good faith for the benefit or security of the party insured, it is not within the scope of the anti-wagering statute or anti-gaming statute. Implicitly, if a policy is not made in good faith, a contract of insurance is not made in good faith or taken out for the security or indemnity of the party insured, then it is within the scope of potentially illegal wagering contracts. But it is true. This has not been applied in the life insurance context that I'm aware of. The trial court found that there was a conflict between these two statutes, and the court ruled that the insurable interest statute will control over the anti-wagering statute. We believe there really is no conflict because gambling and the absence of insurable interest, they are related things, but they are not the same thing. And to explain what I mean, insurable interest describes a relationship, a relationship perhaps between me and another person, another thing, and it's the inherent desire to preserve whatever that other thing is. So if we're talking about my wife, for example, I have an insurable interest. I think the court understands the insurable interest. Okay, but the distinction is that insurable interest describes the relationship, gambling is an activity that a person can engage in. The insurable interest statute said that life insurance policies are not void merely because they lack an insurable interest. And that language, that limiting language is very important because there are plenty of reasons why a policy, a contract of any kind, could be declared void. There are many defects to contract formation. Gambling, lack of insurable interest, at least under the common law, duress, lack of consideration, you name it. And what would be an example, excuse me, of a life insurance policy that doesn't have an insurable interest, but that you would recognize as lawful? Well, and we use these in our brief, and this kind of thing comes up from time to time. The example that I would use is if you have an elderly neighbor, for example, who you're very fond of, very close to, that elderly neighbor tells you at some point that he or she is going to provide money to cover your children's college tuition. If you decide that you would like to insure that because you're now sort of expecting to receive that gift in the future, there's no obligation to make that gift, but it's something that you think might happen. If you took out a policy of life insurance on that person, you may or may not have an insurable interest. Technically, historically, you probably don't. Under much of Wisconsin's decisional law, courts would probably allow that to go forward, but technically there may not be an insurable interest. The insurable interest changes in 1975. It takes that scenario out of the courts. What authority do you have for that statement that they might permit it even if you don't have an insurable interest? Well, if you look at the cases that we cite, the pre-1975 cases, many of them involve disputes where the policy seems to have been taken out in good faith, so it's not a wager, but it's taken out in good faith, and the courts will not void the policy. What do they describe as good faith? I thought I could get the money if he died? No, if you have a true insurance need for the policy, and it's not a wager. There's a difference between the scenario I just described. You have a person that has a relationship. There's an expectation of some sort of financial benefit from the continued life of that person. That's an insurance need, and while there may not be a technical insurable interest, that is not gambling. Is the fact disclosed to the insurance company when you buy the policy that you have no insurable interest, but you think the money would come in handy? The way the insurance company would look at it is they would want to know a lot more about that relationship and whether there's an obligation. They may or may not issue the policy. The question was, give me a situation where there may not be an insurable interest, but it's not a gamble. That's the kind of thing, and the 1975 amendments to the statute make it so that we don't even have to dispute that anymore, because that policy is always going to be valid, a policy that was taken out in good faith, but where there may not be an insurable interest. We don't worry about those anymore, but those are very different than policies that are taken out as plain, old-fashioned gambling. Those policies are void under the anti-wagering statute, and those are distinct from policies that merely lack an insurable interest. One point that I'd like to make about that, the anti-wagering statute was amended in 1993, so 20, maybe 1996, I'm sorry, 21 years after the insurable interest amendments. The anti-wagering statute was amended, and it retained the carve-out for insurance contracts made in good faith. Counsel, I've just read the Ben-Hur case. It doesn't even cite 895.055. I apologize. My memory on the case could be wrong. I will check when I sit down and make sure that I've gotten it right, but my understanding is that the Supreme Court of Wisconsin has that applies in the insurance context, but there are no life insurance contracts that I'm aware of. I think the language of the statute itself makes it clear that it applies in the life insurance or the insurance context because it distinguishes between contracts. You said it was amended. There is a citation in Ben-Hur to 331.055. Is that the prior citation? It very well could be. My memory is that is the case that says it applies to insurance contracts, but the statute itself, we know it applies to insurance contracts because it draws a distinction between insurance contracts made in good faith and ones that aren't made in good faith, and the ones that aren't made in good faith could be within the general prohibition. That amendment in 1996 retained this distinction for insurance contracts made in good faith versus those that are not. If the legislature, by virtue of the insurable interest statute in 1975, said there's no more prohibition on using insurance as a wagering contract, if that was the effect of the 1975 amendments, the legislature would not have drawn that distinction in 1996 when it revised the anti-wagering statute. You gave the example of the elderly neighbor, no insurable interest but not in bad faith and so on. How does this case differ? What we know in this case is that we have an insured in California took out a policy and there was a Wisconsin trust that owned the policy. The company knew that much in 2007 when it issued the policy. They received a death claim from U.S. Bank, which served as securities intermediary for an investor, and the company began to ask questions about whether this policy was valid at inception or not. I know this court is aware of STOLE. It's a phenomenon that has affected the insurance industry. They know much more about STOLE now than they did in 2007, and when they get a claim, if it has some indicia of STOLE, they ask some questions. In this case, they asked some questions, they contacted some family members, they had no idea a policy had ever been issued. What would be true in your elderly neighbor case also? In my elderly neighbor example, I'm assuming the owner of the policy is the family, the insured is the elderly neighbor, and the family is the one submitting the claim later on. You said an elderly neighbor. That's not a relative. I meant an elderly... You said, as I understand it, that you thought you, the person who buys the policy, you thought your elderly neighbor would leave you some money, and you wanted to guarantee that, so you take out a life insurance policy on him, right? Yes. And that's okay, you say. Well, maybe. What I'm saying is that... Well, you did say it was okay. No, no, what I mean... Is that illegal? No, what I mean is that under the insurable interest statute, we don't have to come in here and dispute whether there's an insurable interest or not. That policy will not be void under the insurable interest statute, the amendments that took effect in 1975. We don't have to worry about disputing that anymore after 1975, because the insurable interest statute changed. So why didn't you proceed the way the insurable interest statute provides? It says you pay the proceeds to somebody with an insurable interest, no matter what the policy says. So if the bank does not have an insurable interest, and you're worried that this is third-party financing, the insurance company can totally defeat that scheme by paying the money to the trust or to the survivors. Then the people, the outsiders who have financed it, never see a penny. They have no reason to finance it. Right, well, I think that's a fair question. One of our counterclaims was a claim for... Well, so it's a fair question. So what is the answer? Why didn't Sun Life do that? Well, we tried, we tried. That's my point. We tried. We filed a counterclaim for declaratory judgment, sort of in the nature of an interpleader, saying that if there's no insurable interest, then the bank may not get the money. Look, look. An interpleader means you take the money and you deposit it in the court's registry, and you say we're not interested in who gets it, but here are the potential claimants. Did you deposit $6 million in the court's registry? No, we did not. Then you did not file an interpleader. No, no, we filed a declaratory judgment raising the very issue that Your Honor raised. No, look, if you want to do this, you write a check to the estate, or you file a real interpleader. You don't come up with empty words. One other thing that we cannot lose sight of, and I'll try to be very brief, if the insurable interest statute permitted authorized gambling with life insurance, then it did violate Wisconsin's Constitution. And one of the things that we cited, I don't have time to go into all of it, but one of the things we cited was the Wisconsin Legislative Reference Bureau's evolution of authorized gambling, and consistent with what we argued, it's very clear that the state of Wisconsin simply does not permit any form of gambling whatsoever except what's specifically permitted in the Constitution. Anything else is prohibited. In 1973, the state of Wisconsin amended their Constitution so that churches could engage in bingo. And at the same time, the appellee suggests that the legislature did authorize life insurance to be used as a wager when it felt that it had to go back to the Constitution so that a church could engage in bingo. With that, I will sit down. Okay, thank you, Mr. Gosselin. Mr. Farrella? Thank you, Your Honor. May it please the Court. Sun Life here did exactly what the Wisconsin legislature forbid it from doing. Forty years ago, Wisconsin passed Section 631, which prevented insurers from denying coverage on the ground of lack of insurable interest. Sun Life here... Why did they do that? It seems so strange. You know, there's this old Oliver Wendell Holmes opinion in which he said, a contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter-interest in having the life come to an end. Why isn't that still true? Well, that is... I believe that's the Grigsby case from the Supreme Court, and that was the common law rule. The common law rule was... Sounds very sensible. Well, that is certainly an approach, and no one here is suggesting that contracts lacking insurable... Why was the law changed? The law was changed based on the work of Professor Spencer Kimball, who was dean of Wisconsin Law School at the time. His analysis was... His analysis was, and he chaired the law committee that drafted this statute in the 1970s, the analysis was, insurable interest as a matter of policy validity is meant to address two public policy concerns. One is the moral hazard. Don't create an incentive for somebody to kill the insured  Worst public policy concern ever in any part of insurance. And the second is to discourage what Justice Holmes wrote in Grigsby as a mischievous form of gaming. Betting on human life, betting on death, there were all sorts of betting pools and wagers and all sorts of pernicious things like that, and society was uncomfortable with that, and so insurable interest arose to try to address those two policy concerns. Professors Kimball, in 20 years of study on this, said it's an important underwriting point, but as a policy point to prevent it, a claim, having that as a basis for policy and validity, doesn't in fact advance those. The better way to advance those two policy interests is to put all of the incentives on the insurance company to do really thorough underwriting. Do its homework at inception. Prevent this from happening in the first instance. That just sounds like a formula for driving up the price of insurance. You can't issue an insurance policy without hiring a private detective to figure out who's really buying it and who's really going to get it. Well, it's a competitive business. It won't be the insurance company paying for the private detective. It will be the insured. So there will be 100 or 200 or 300 people who are not trying to pull the wool over anybody's eyes, who have to pay for a private detective and wait the time it's needed to have it done, and they're not getting any benefit out of it. They just get costs. I appreciate that, and that's certainly a logical view, Judge Easterbrook, but the reality is that right now insurance underwriters do that analysis. They ask questions, they look at documents, they get inspection reports from third parties to verify applications. That process is happening now. That is their obligation, and it's good business for insurance companies because underwriters are the guardians of risk. Do they inquire whether the applicant for the policy has an insurable interest? That question is not asked specifically. Some carriers ask... How is it asked if it's not specifically? So they will ask things like what the insurer's intention is. These questions weren't asked here, but... I'm interested in getting the money if somebody dies, so that's pretty obvious. The question is what is your interest in his continuing living, or what expectation do you have from the NAFI? That's something that the underwriter can understand as part of the process. Does it happen? Is that how it happens?  the purpose for the policy in order to understand the risk. So the insurance company knows that at the time it issues the policy, it's issuing to somebody who has no insurable interest. Well, that is something that they need to discern, and if they discern that there is no insurable interest, no accepted relationship between the parties... May they then continue to issue the policy even if there is no insurable interest? No. Under Wisconsin law 631-071 says that the insurance company may not issue policies that lack insurable interest. That is prohibited. 631-074, which is the relevant statute here, is entitled effective lack of insurable interest or effective consent. So what happens if there is a policy that lacks insurable interest, or a policy that was issued where the insurer did not consent to a third-party buying policy? The most pernicious type of wager. And in that circumstance, the legislature said the policy is not invalid, so insurance company must pay. They, in Judge Easterbrook's words, have to write a check. But if there are competing claimants, if there is somebody with a superior equitable right, then the court with appropriate jurisdiction, that's in the statute, can address those competing claims and distribute the proceeds accordingly. The policy rationale for that in the legislative comment, and in all of Professor Kimball's... I kind of wish you would stop saying policy rationale, since we're talking here about a policy of insurance. It becomes very confusing. The legislative rationale was to put the onus on the insurance company to do more diligence. That, in the first instance, would do a better job of reducing wagering contracts from being issued than giving them an option many years later to contest or not contest as they see fit. That system, according to Professor Kimball... It's just that it works. It works on a different party. If the money is going to be paid to somebody who has an insurable interest, that statute removes the incentive for somebody who lacks an insurable interest to get the policy, because then presumably they pay the premiums  Absolutely right. Absolutely right. So it increases the incentive on the insurer to do due diligence, and it removes the incentive on a true, nefarious stranger to violate the law and to have wagering contracts issued. So that's the legislative rationale, and there is no doubt that that's what the legislature intended here. This is not a circumstance where we have to guess. So do you agree with Mr. Goslin's example of the neighbor, the elderly neighbor, who you think might leave you something in his will, but just to be on the safe side, you take out an insurance policy on his life? Well, in that circumstance, Your Honor, there is an insurable interest. There is a pecuniary interest in that likely or intended set of future guests. But you're doing this without the permission of the insured. I'm sorry? You're doing this without the permission of the insured. Well, if that's true, that would violate the consent requirement in Wisconsin law. Well, then what are these cases in which there's no insurable interest, but nevertheless the insurance contract isn't void? So that depends on the particular state at issue. In Wisconsin, if there is no insurable interest, and hence the policy is a wager because those two things are the same, there is no difference, then under 631 the policy would not be void, it would be enforceable, and it would be, if there were competing claimants, a proceeding to address that at equity. Other states, like this one in Illinois, at common law say... When you say enforceable... The insurance company has to pay. ...enforceable, but not necessarily by the... not necessarily to the benefit of the person who took out the policy? Not necessarily, but if the policy owner is the only one that's made a claim, then... Right, but if others made a claim... Like the children of the elderly neighbor or something, then they might... Then a court with jurisdiction over those parties, appropriate jurisdiction, as 631 says, could address those competing claims as a matter of equity. Here we don't have competing claims. Sun Life knew at the time it filed its answer that there were not going to be competing claims. They didn't do a proper interpleader, and here U.S. Bank is the only claimant. The elderly example thing is a misnomer. There's an insurable interest there, but frankly, for 150 years, every case has equated insurable interest in wagering. The Grigsby case that Your Honor cited, the Schaeffer case, the Warnock case, Grigsby, and a whole series of cases in Wisconsin that adopt all of those. Heard against Doty, Albrecht, Ben-Hur, all of them equate insurable interest in wagering If a policy has an insurable interest, it's not a wager. If a policy lacks insurable interest, it is a wager. Those are synonymous. They're exactly the same. There is no case that has ever said anywhere that a policy lacking an insurable interest is not a wager or a policy with an insurable interest is a wager. Simply not there. And so Sun Life's argument depends entirely on there being some difference between those two terms, and it doesn't exist. 895, this gambling statute, it's never been applied to life insurance, but the good faith exception has been applied in property insurance twice by the Wisconsin Supreme Court. Ben-Hur, which cited the predecessor to 895, and Spencer, and also Stebbin Nash, 27, Wisconsin, 2nd, 112, both said good faith only means that the policy has an insurable interest, nothing more. And so the policy is not a gamble if there is an insurable interest. Well, 895 adds nothing to this because it simply says a policy is not a wager if it has an insurable interest. That restates the common law. 631 says an insurer cannot contest on the basis of lack of insurable interest or lack of consent. And the insurance code section, the 600s, supersedes any conflicting statute. The insurance code says that in 600.12. And so 895 only deals with insurable interest, doesn't add anything to this. Sun Life's interpretation of the Constitution is also incorrect. The statute doesn't authorize any gambling here at all. It doesn't say you can issue policies without insurable interest, which are wagers, and in fact prohibits it. But further, Your Honor, the Wisconsin Supreme Court has interpreted the constitutional provision about gambling only to apply to games of chance. That's the Dairyland against Doyle case and the Panzer against Doyle case, 2004 and 2006, finding authority that says that provision doesn't apply to insurance or commercial contracts. Sun Life has no answer. Further, the statute doesn't authorize gambling. It simply addresses what the remedy is if a policy lacks insurable interest. That simply isn't authorizing gambling at all. Here, Your Honor, there's no constitutional issue. There is no independent wager defense, because wager and insurable interest are the same things. And that has been the law for 150 years in this country. US Supreme Court cases, Wisconsin Supreme Court cases, consistently hold that. Sun Life has no case to the contrary. There's no contrary authority that they've cited. There's no dispute about that. 631 trumps 895 if there's a conflict by the explicit provisions of the insurance code. There is no, here, reasonable dispute about what the law was. There's no disputed cases. And so their position is not fairly debatable and not objectively reasonable. And so the court's findings as to statutory interest and bad faith also ought to be affirmed. It's also worth noting. So does Sun Life get to keep all this money? No. Sun Life, the decision below which should be affirmed is that they pay the $6 million of the death benefit. That they pay? They pay the $6 million death benefit to US Bank, that they pay 12% statutory interest, and that they pay whatever the district court concludes are the reasonable attorney's fees. Those are the decisions below. They certainly keep the premiums of $2.5 million that they've collected. Pardon? They certainly keep the premiums of $2.5 million that they've collected for the bargain of issuing the policy. The bank keeps it. No. Sun Life does. So the policyholder paid $2.5 million in premiums over seven years for this policy. It's a $6 million policy. The judgment below which should be affirmed is that Sun Life would pay the $6 million death benefit to US Bank, plus interest, plus the fees. But what? Plus the statutory interest, plus the attorney's fees on the death benefit. For refusing to pay in the beginning. For refusing to pay in the beginning, not paying within 30 days when the claim became due, which was constant statute to provide, and not being able to prove a fairly debatable or reasonable excuse for not paying in the first place. Well, wait. I'm getting confused now. So you want, you're US Bank, so you want how much? So the policy death benefit is $6 million. Is that what the order down in the card below says? Yes. That you get the money, plus the interest, plus the attorney's fees? Yes, exactly. So all you want is a simple affirmance. Absolutely right. Okay. You want the $6 million? Yes. And the $6 million, that's the insurance policy? That's the insurance policy. That's the face amount of the insurance policy. And there's no superior claimant to it than the bank? There is none. The family members told US Bank, we don't know about this. This isn't our policy. We're not making any claim. Sun Life filed sort of a pseudo interpleader, a declaratory judgment, but they didn't name any other adverse claimant. The district court properly dismissed that claim because there was no case for controversy. There's no competing claim. And what's the $2,800,000? I'm sorry, Ron? What is the $2,800,000? It was the premium paid already. Exactly. Over seven years, the trust paid $2.5 million. The trust first and then USA. Sun has already collected $2.5 million, which is a premium for the whole policy. Exactly right, Judge Bauer. So that's not part of this. Sun Life keeps that. That's fine. I see. So it's only what the court ordered below. I'm sorry. Well, thank you. Thank you, Mr. Thank you, Your Honor. Mr. Gosselin. I know I exceeded my rebuttal before, so I'll try to be brief. Judge Easterbrook. I checked. Yes, it has been her and it cited the predecessor to the statute. So that's why the number is off. But just very briefly, either insurable interest in gambling are different things, in which case there's no conflict. And Sun Life can invoke the anti-wagering defense. Or they're the same thing. Gambling and the lack of insurable interest are synonymous, which is U.S. Bank's position. And in that case, we can come to one conclusion, which is that the legislature authorized life insurance to be used as a wager in 1975. And our position is that if it actually intended to do that, and we don't think it did, but if that's the conclusion, then the legislature went beyond its authority granted in the Constitution. And historically, going back to the Constitution in 1848, the Constitution said that all lotteries are banned. And a lottery was understood very broadly. It was anything that required a prize, consideration, and some element of chance. So the definition of lottery historically is what we sort of understand gambling to be, these three things. So you want the $6 million? Well, if the policy is void, yes, the $6 million would not be paid. You want to keep the money? Well, yes, we do. And let me be very clear. If this is a wagering policy, we want to keep the money. If it is not, we want to pay the money. The insurance company, they investigated this claim. And there's varying law throughout. This is an item of academic interest. If the policy is void, would you give back that two and a half minutes? Perhaps. No, not perhaps. Would you or wouldn't you? I mean, I don't know, as I stand here today, I don't know what Wisconsin requires. Some states require it, some states don't. We will do whatever the law requires us to do. We haven't gotten there in this case, but we would, and we've done it in the past. I'm losing the thread. What is your basis for keeping the $6 million? If the policy is, if it's an illegal contract, so this policy. Why do you get the $6 million? Well, if it's an illegal contract, there was no contract. No contract was ever formed.  What's your entitlement to the $6 million? I don't get that. There is no $6 million because there is no contract. That's the issue. But you have $6 million, don't you? Well, I mean, we have a claim for $6 million on a policy. If the policy is an illegal contract to begin with, then there's no $6 million. So you're not asking for any money or what? No, no. We were seeking, we got a claim, we investigated it, and we got sued. I'm completely lost now. Okay. What is it you want to take away from this suit? Anything? No. What are you appealing about? We were sued for breach of contract. We were in the middle of investigating a claim. We got sued for breach of contract because we didn't pay the claim already. And our response to that was, we have indicia that this is a wagering policy, and we're investigating it to find out what it is. What you want is the reversal of the court's decision, send back down and let it stand. You keep the money you got, and no, you don't get any. Well, yes. But what we're looking to do is to go back. Is not pay them the $6.5 million. I actually don't agree with that. If it's not a wagering policy, we will pay the $6 million. We never got the chance to make a determination because we got sued, and then when we asserted the affirmative defense, the judge entered judgment on the pleadings against us. We had no discovery. Now I'm completely lost. Okay. The district judge held that it was not a wagering contract. No, no, no. The district judge said we cannot proceed. The district judge held that it was not a wagering contract and added penalties under Wisconsin law. So given what you've just said, why isn't your position that you will pay the $6 million, but you don't think you owe the additional penalty amounts? That doesn't seem to be your position. Well, respectfully, the judge said we are not allowed to invoke the wagering defense. We answered the complaint. We never took any discovery. The plaintiff filed a motion for judgment on the pleadings, and the judge said we're not allowed to pursue that defense. The judge was obligated to accept our allegations of fact as true, and we said it was a wagering contract. But not your allegations about the meaning of state law. The judge told you the meaning of state law. He told you that you owe the $6 million, and you have refused to carry out that part of the judge's order. Now, anybody is entitled to ask us to reverse, but all of us are, I think, baffled by your statement. We want to pay the $6 million. You are asking us for an order freeing you of any obligation to pay the $6 million.  You are opposing it and have opposed it from the get-go in this case. And now you're just making the members of the bench angry at you. Well, I'm sorry. There's a basic rule when you're in a hole. Stop digging. See? Your time has run out anyway, so you're safe. You can have another. Look, I don't want to dig a hole, but I want you to understand. You've already dug it. I apologize, Your Honor. You don't have to apologize to me. You might have to apologize to your client. The company never had the chance to make a claim determination because it got sued. That's what happened here. The company, had it had the chance to complete its claim decision, it may have paid the policy. Why would being sued prevent it from continuing to investigate whether it had a claim? It can investigate and it's done as much as it can do without getting discovery. That's why. The company tried to get information. Why do you need discovery? You're entitled to the cooperation of the insured. We didn't get that. We asked for documents from the insured and we didn't get that. Then you could say we're failing to pay the policy because the insured refused to cooperate. That's a ground totally distinct from any of the arguments you've been making in this case. Flee, if you will. Okay. Well, thank you, Mr. Gosselin and Mr. Thaler.